**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID PAUL SUDAC, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:18–cv–410 (JCH) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, Acting | : | APRIL 24, 2019 |
| Commissioner, Social Security | : | |
| Administration, | : | |
| Defendant. | : | |

**RULING RE: MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. NO. 25) &
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (DOC. NO. 27)**

## I. INTRODUCTION

Plaintiff David Paul Sudac ("Sudac") brings this appeal under section 405(g) of

title 42 of the United States Code from the final decision of the Commissioner of the

Social Security Administration ("SSA"), which denied his application for Title II disability

insurance benefits and Title XVI supplemental security income. See Complaint

("Compl.") (Doc. No. 1). Sudac filed a Motion for Judgment on the Pleadings (Doc. No.

25), seeking vacatur and reversal of the Decision rendered by Administrative Law Judge

("ALJ") Martha Bower, which affirmed the Commissioner's denial. See Motion for

Judgment on the Pleadings ("Mot. to Reverse") (Doc. No. 17). The Commissioner

moves for an order affirming the ALJ's Decision. See Mot. for Order Affirming the

Decision of the Comm'r ("Mot. to Affirm") (Doc. No. 18).

For the reasons set forth below, the Motion for Judgment on the Pleadings is

granted and the Motion to Affirm the Decision of the Commissioner is denied.

## II.    PROCEDURAL HISTORY

Sudac applied for disability income benefits on December 11, 2014, and applied for supplemental security income benefits December 23, 2014, alleging a disability onset date of March 23, 2013.  See R. at 19.  The Commissioner denied Sudac's application initially on April 20, 2015, and upon reconsideration on October 5, 2015.  Id. Sudac requested a hearing with an ALJ, which was held by video before ALJ Bower on December 30, 2016.  Id.

On February 24, 2017, ALJ Bower issued an unfavorable decision for Sudac, affirming the Commissioner's denial and finding that Sudac was not disabled.  See id. at 35.  Specifically, the ALJ found that Sudac's impairments did not meet or equal any listing, see id. at 25, and that with his level of residual functional capacity ("RFC"), there were jobs in the national economy that he could perform, see id. at 34–35.  The Appeals Council denied Sudac's request for review on January 9, 2018.  Id. at 1.  Following that denial, ALJ Bower's February 24, 2017 Decision became a final decision reviewable by this court.  See id. at 2.  Sudac filed this appeal on March 8, 2018.  See Complaint (Doc. No. 1).

## III.    FACTS

While the parties did not file a joint stipulation of facts, many of the facts are undisputed.  Compare Summary of Facts in Support of Motion for Judgment on the Pleadings (Doc. No. 25-2) ("Sudac SOF") with Response to Plaintiff's Statement of Facts (Doc. No. 27-2) ("Comm'r SOF").  The court adopts the parties' Statements of Fact to the extent the facts are agreed upon, and it will therefore only briefly describe the facts relevant to this Ruling.

Sudac was born on August 17, 1990, and was 26 years old at the time of his hearing on December 30, 2016. <u>See</u> R. at 211.[1] In January 2009, Sudac was brought to an emergency room after throwing objects in his house and driving erratically. Sudac SOF ¶ 14.[2] Sudac reported becoming "very angry" after receiving a negative result from a colonoscopy, related to chronic abdominal pain and "bowel disregulation" over the previous year. <u>Id.</u> ¶ 15. Sudac also reported feelings of depression associated with his chronic abdominal problems. <u>Id.</u> ¶ 16.

Beginning on March 26, 2013, Sudac was seen at the Branford Counseling Center for reports of severe anxiety and panic attacks. <u>Id.</u> ¶¶ 17–19. Sudac reported he had been prescribed a medication to assist with his anxiety but had stopped taking the medicine due to sexual side-effects. <u>Id.</u> ¶ 20. At various times during his treatment, Sudac reported regular marijuana use as a form of self-medication. <u>See, e.g.</u>, <u>id.</u> ¶¶ 26, 37. Dr. Tracy Robinson, Psy.D evaluated Sudac, and reported that he exhibited "obsessional worrying," admitted to having suicidal thoughts (without intent or plan), and that Sudac reported a desire to be free of his physical IBS symptoms and to "get back to normal" emotionally. <u>Id.</u> ¶¶ 23–25. Dr. Robinson diagnosed Sudac with major depressive disorder, cannabis dependence, OCD, and IBS. <u>Id.</u> ¶ 27.

On July 4, 2013, Sudac was admitted to Natchaug Hospital, where he reported depression, severe IBS with diarrhea, and related anxiety and obsessive behavior. <u>Id.</u> ¶¶ 29–30. Sudac stated that he was fearful of using public restrooms and was

---

[1] While Sudac states he was 25 at the time of the hearing, <u>see</u> Sudac SOF ¶ 11, the length of time between his date of birth and the date of the hearing before ALJ Bower—both of which are undisputed—indicates he was 26 at the time of the hearing.

[2] Unless otherwise noted, the facts are undisputed.

transferred to Silver Hill Hospital after four days due to his inability to use the restroom at Natchaug Hospital.  Id. ¶¶ 38–39.

Sudac was admitted to Silver Hill Hospital on July 8, 2013.  See Sudac SOF ¶ 39; Comm'r SOF ¶ 40.[3]  Sudac reiterated many of the same complaints, including anxiety, IBS, inability to urinate in public places, depression, and suicidal ideation.  Id. ¶¶ 41–44.  When discharged from Silver Hill Hospital, Sudac was still anxious but "much less irritable," his condition was stable, and his prognosis was good.  Comm'r SOF ¶ 46.

Sudac attended an intensive outpatient treatment program at Hartford Healthcare from February 4, 2014 to April 14, 2014.  Sudac SOF ¶ 47.  He was thereafter treated at the Anxiety Disorders Center of the Harford Hospital, Institute of Living.  Id. ¶ 52.  Sudac again reported anxiety, obsessive behavior, compulsions, and a fear of public urination. Id. ¶¶ 53–59.  Starting in June 2014 and continuing through January 2016, Sudac was treated by Dr. Hannan at the Anxiety Disorders Center.  Id. ¶¶ 63, 76.  As part of his treatment, Sudac was encouraged to engage in exposure exercises, where he would attempt to travel to and use public restrooms.  Id. ¶ 65.  These exercises were successful to the extent that Sudac was able to use public restrooms to some degree, though some progress was lost towards the end of treatment.  Comm'r SOF ¶ 76.

From at least February 2013 onwards, Sudac reported difficulty evacuating his bowels.  Sudac SOF ¶ 80.  He reported that he spent long periods, especially in the morning, attempting to empty his bowels, feeling only partial evacuation, and needing to return to a restroom again shortly thereafter.  Id. ¶ 86.  Colonoscopies revealed internal

---

[3] Sudac indicates that he was admitted to Silver Hill Hospital on July 15, 2013.  See Sudac SOF ¶ 40.  The Commissioner correctly notes that the admission date was July 8, 2013.  R. at 492.

and external hemorrhoids, which was treated through surgical procedures.  Id. ¶ 84.
The treating gastroenterologist, Dr. Aversa, diagnosed an "obvious obstructed
defecation syndrome."  Id. ¶ 87.  Sudac was also treated by Dr. Bogardus, who noted
that Sudac's primary complaint was related to variable bowel movements.  Id. ¶ 95.
Sudac did not exhibit acute pain, though he did report gassiness and bloating; Dr.
Bogardus noted that Sudac's symptoms were consistent with IBS.  Id. ¶¶ 95–98.

State agency psychological consultants Dr. Kelly Rogers and Dr. Jon Perlman
concluded, based on a Psychiatric Review Technique, that Sudac had mild restrictions
of daily activities and moderate limitations in social functioning, but that his conditions
did not preclude work.  Comm'r SOF at 5, 6.  Based on a review of records, Dr. Quinlan,
a state agency medical consultant, concluded that Sudac suffered from IBS, paruresis,
and anxiety disorder, but that the IBS and paruresis were not severe.  Id. at 6.  Dr.
Gurcharan Singh, a state agency medical consultant, affirmed Dr. Quinlan's
conclusions.  Id. at 6.

## IV.    STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not a function of
the district court to review de novo the ALJ's decision as to whether the claimant was
disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court
may only set aside an ALJ's determination as to social security disability if the decision
"is based upon legal error or is not supported by substantial evidence."  Balsamo v.
Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence requires "more than a
mere scintilla," but is a "very deferential standard of review."  Brault v. Soc. Sec. Admin.,
Comm'r, 683 F.3d 443, 447–48 (2d Cir. 2012).  It requires "such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."  Id. at 448.  If the

Commissioner's findings of fact are supported by substantial evidence, those findings

are conclusive, and the court will not substitute its judgment for the Commissioner's. 42

U.S.C. § 405(g) (2016); see also Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

## V.    DISCUSSION

Sudac argues that ALJ Bower's decision should be reversed or remanded for

three reasons. First, he argues that ALJ Bower erred in concluding that Sudac's

irritable bowel syndrome ("IBS"), obsessive compulsive disorder ("OCD"), and paruresis

(commonly known as "shy bladder") did not constitute severe conditions within the

meaning of the applicable regulations. See Sudac Mem. in Supp. (Doc. No. 25-1) at 10.

Second, Sudac argues that the ALJ committed legal error in her application of the

treating physician rule as to all of the opinions provided by treating sources. See id. at

18. Third, Sudac argues that the ALJ erred in allocating undue persuasive weight to the

opinions of consultative examiners. Id. at 19.

### A.    Severity of Impairments

Sudac argues that the ALJ committed error by finding that Sudac's diagnoses of

paruresis, OCD, and IBS were not severe conditions. See id. at 10. The government

argues that the ALJ properly determined that the conditions were not "severe" and,

alternatively, that any error as to whether the conditions were severe was harmless.

See Mot. to Affirm at 3–6. "[T]he standard for a finding of severity under Step Two of

the sequential analysis is de minimis and is intended only to screen out the very

weakest cases." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). An ALJ's finding

that an impairment is not severe at Step Two is harmless error when, as here, the ALJ

finds other severe impairments and continues with the sequential evaluation. See, e.g.,

Prince v. Berryhill, 304 F. Supp. 3d 281, 294 (D. Conn. 2018). Given that the ALJ found

several of Sudac's impairments to be severe and proceeded to the next step of the sequential evaluation process, any error at Step Two was harmless error.

B. Treating Physician Rule

SSA regulations give the opinions of treating physicians "controlling weight," so long as those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2);[4] see also Lesterhuis v. Colvin, 805 F.3d 83, 88 (2d Cir. 2015). In other words, "the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)). Regardless of the weight given to a treating source's opinion, the ALJ must provide "good reasons" for the decision. See 20 C.F.R. § 416.927(c). The Regulations define a treating source as follows:

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

20 C.F.R. § 404.1527(a)(2); id. § 416.927(a)(2).

_____

[4] This Regulation has been amended, but the amended version does not apply to this case, which was filed before the new medical evidence rules became effective on March 27, 2017. See 82 Fed. Reg. 5,844 (Jan. 18, 2017), 2017 WL 168819.

Where a treating source's opinion is not given controlling weight, the regulations require the ALJ to consider several factors in determining the weight to be afforded the opinion. Id. These factors include: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the strength of support for any medical opinion; (4) how consistent the opinion is with the record as a whole; and (5) whether the treating source is a specialist about the issues discussed in the medical opinion. Id. An ALJ must "explicitly consider" the factors in order to overrule a treating source opinion. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam). Even if a treating source's opinion is not given controlling weight, it may still be entitled to significant weight "because the treating source is inherently more familiar with a claimant's medical condition than are other sources." Tankisi v. Comm'r of Social Sec., 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988)). A treating physician opinion is especially valuable "with respect to mental health issues because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the claimant." Carton v. Colvin, No. 3:13–CV–379 (CSH), 2014 WL 108597, at *15 (D. Conn. Jan. 9, 2014) (citing Bethea v. Astrue, 3:10–CV–744 (JCH), 2011 WL 977062, at *11 (D. Conn. Mar. 17, 2011)).

1.    Daily Activities Form

In assessing the weight to be afforded to the treating sources, the ALJ frequently referenced Sudac's level of activity as a significant source of contradiction in the record. See R. at 32 (assigning little weight to Dr. Hannan's opinion because Sudac attended college classes); id. at 33 (finding Dr. Robinson's opinion inconsistent with Sudac's "activities including his attending college with a 3.95 GPA"); id. at 33 (finding Dr.

Liebmann's opinion inconsistent with the record "in light of the claimant's activities" including attending college).

The ALJ noted that Sudac's activities of daily living "belie[d] the severity of the symptoms alleged."  R. at 30.  The ALJ noted that Sudac was able to carry out a number of activities, including, inter alia, attending college, performing self-care, doing homework, doing chores, go shopping, and following instructions.  See id. (citing Exhibit 4E).  While the form does indicate Sudac was able to carry out the above tasks to some degree, the narrative portions of 4E, which were not addressed by the ALJ, indicate that his symptoms had an outsized impact on his life.  For instance, Sudac noted that, while he was able to attend college classes, he woke up early on school days to avoid "pressure to use the bathroom quickly to make it to class on time," that he returned home to use the bathroom between each class, and that after class his activities were limited to doing homework and going to sleep.  R. at 261.  Sudac also noted that his symptoms precluded him from taking part in social events and had been "the downfall of most of [his] jobs."  Id. at 262.  He added that it takes him one to two hours to complete a bowel movement, and that urination frequently takes multiple attempts, which varies based on stressors.  Id.  When he fails to urinate, he cancels plans.  Id.

Sudac argues that the ALJ mischaracterized the record by failing to note the narrative portions of the daily activities form in her analysis.  Mot. to Remand at 17–18.  The Commissioner responds that the ALJ's summary was truthful, and that the ALJ was not required to mention every item of testimony presented to her.  Mot. to Affirm at 11.  While the ALJ is not required to list or analyze every piece of evidence put before her, the ALJ may not "cherry-pick" evidence to support a conclusion and fail to note

evidence in the record, let alone in the same document, that contradicts that conclusion. Sena v. Berryhill, No. 3:17-CV-912 (MPS), 2018 WL 3854771, at *9 (D. Conn. Aug. 14, 2018) ("It is well-settled that an ALJ may not 'cherry-pick' evidence by 'improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.'") (quoting Rodriguez v. Colvin, No. 3:13-CV-1195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016)); see also Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion.") (internal citations omitted); Dowling v. Comm'r of Soc. Sec., No. 5:14-CV-0786 (GTS/ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) ("The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both."). Therefore, insofar as the ALJ relied on Sudac's daily activities, the ALJ mischaracterized the record and erred as a matter of law.

## 2. Dr. Hannan, Ph.D.

The ALJ gave "limited" weight to Dr. Hannan's December 2014 assessment of Sudac's mental functioning. R. at 32. In Exhibit 4F, Dr. Hannan indicated that Sudac suffered from a condition or combination of conditions that prevented him from working. R. at 380. Dr. Hannan diagnosed social phobia, persistent depression, OCD, and agoraphobia. Id. He noted that Sudac relayed a fear of using public restrooms and that Sudac's anxiety and fear led him to limit where and how long he travelled. Id. at 383. Dr. Hannan assessed moderate limitations (a diminished capacity to perform) in the following areas: performing within a schedule; working with others; completing a normal workday without psychological interruption; accepting instructions and responding to

criticism; and responding to changes in work settings.  Id. at 384–85.  Additionally, Dr. Hannan assessed a markedly limited ability to travel in unfamiliar places or use public transportation.  Id. at 385.  The ALJ provided a brief explanation for the limited weight afforded to Dr. Hannan's assessment, noting that the assessment "was contradictory in that the mild to moderate mental limitations would not preclude work."  Id. at 32.  The ALJ also noted that the marked limitation noted for public transportation use and visiting unfamiliar places did not affect Sudac, because he was able to drive, he was able to see his treatment providers, and he "stated he sought out places he would not run into people he knew."  Id.

The court notes, as an initial matter, that aside from addressing the treating source opinion's consistency with the record, the ALJ did not address any of the other factors noted in the Regulations, including the length of the treatment relationship; the nature and extent of the treatment relationship; the strength of support for any medical opinion; and whether the treating source is a specialist about the issues discussed in the medical opinion.  The ALJ therefore failed to "explicitly consider" the relevant factors before overruling a treating source opinion.  See Selian, 708 F.3d at 418 ("In order to override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequen[cy], length, nature, and extent of treatment . . . .").

Secondly, even as to consistency with the record, the ALJ pointed to no evidence in the record to support the statement that the limitations noted by Hannan would not preclude Sudac from working or explain why the ALJ reached a different conclusion than the one provided by the treating source.  The ALJ also disregarded Dr. Hannan's conclusion that Sudac exhibited a markedly limited ability to travel to unfamiliar places

because (1) he was able to travel to see his treatment providers and (2) he stated that he "sought out places he would not run into people he knew." R. at 32. As to the former, it is unclear, and the ALJ did not explain why, a patient's ability or willingness to seek treatment with a medical professional would necessarily mean that he would be able to seek or maintain employment. As to the latter, the ALJ did not point to any evidence in the record that Sudac was able to, or did, regularly travel to unknown locations. It appears that the ALJ inferred, from Sudac's preference to seek out places he would be less likely to encounter people he knew, that Sudac was travelling to locations that he did not know. But one does not follow from the other. Sudac could have been travelling to locations he was familiar with, but at which he was still unlikely to encounter acquaintances or friends.

Finally, Dr. Hannan's findings were generally consistent with the other treating source opinions, including those of Dr. Robinson and Dr. Liebmann. Dr. Robinson concluded that the combination of Sudac's diagnoses precluded him from working. See id. at 369. She concluded Sudac was "severely impacted by OCD and depressive symptoms particularly regarding the effects of [IBS] . . . ." Id. at 372. Dr. Liebmann concluded that Sudac suffered from OCD and depression, which manifested symptomatically as "continuing excessive worry and inability to use public bathrooms." Id. at 680. Dr. Liebmann concluded Sudac's symptoms would significantly impact his ability to perform work tasks. See id. at 681 (noting Sudac would be precluded from carrying out multiple tasks more than 15 percent of the time). Because Dr. Hannan's opinion was not contradicted by substantial evidence in the record, and because the ALJ did not analyze the opinion under the remaining factors, the ALJ failed to provide

12

"good reasons" for failing to afford the opinion controlling weight, and instead affording the opinion limited weight.

### 3. Dr. Robinson, Psy.D.

As to Dr. Robinson, who treated Sudac in relation to his anxiety and other mental impairments, the ALJ afforded Dr. Robinson's opinions in Exhibit 3F "little weight." R. at 32. Dr. Robinson filled out a State of Connecticut Department of Social Services ("DSS") Medical Statement. R. at 366–76 (Exh. 3F). Dr. Robinson noted that Sudac suffered from "severe anxiety compounded by severe Irritable Bowel Syndrome." Id. at 369. She also noted that Sudac has a "serious aversion to using any bathroom other than at his home," and that Sudac "becomes physically unable to eliminate urine or bowel" when in public. Id. Dr. Robinson supported her diagnoses of OCD and Major Depressive Disorder by reference to the supporting symptoms, objective findings, and supportive test results. Id. at 370. Dr. Robinson further concluded that Sudac was "severely impacted by OCD [and] depressive symptoms particularly regarding the effects of [IBS]." Id. at 372. Dr. Robinson marked the box indicating that Sudac's mental health issues "impact his . . . ability to work." Id. Dr. Robinson also indicated that Sudac exhibited a "Markedly Limited" ability to: (1) perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances; (2) complete a normal workweek without psychological interruptions; and (3) travel in unfamiliar places or use public transportation. Id. at 373–74. The ALJ afforded these conclusions little weight because Dr. Robinson's conclusions were "not consistent with the overall record including her notes." R. 32. The ALJ added that Dr. Robinson's findings of marked limitations were "not consistent with the intact mental status exams or the claimant's activities including his attending college with a 3.95 GPA." Id. at 33.

The Commissioner argues that the ALJ was correct to find that the assessed limitations in Exhibit 3F "were inconsistent with Dr. Robinson's examination findings, which included normal appearance, speech, thought process and content, and associations; no abnormal/psychotic thoughts; fair to good judgment and insight; full orientation; intact memory and fair attention and concentration." Mot. to Affirm at 9. However, the portions of the transcript to which the Commissioner cites are not Dr. Robinson's treatment notes. See id. (citing to R. at 402–09). While the cited pages note that Dr. Robinson is Sudac's primary clinician, they are in fact the notes of Doctor Bemis, see R. at 402, and Dr. Liebmann, id. at 403–08.

As to the ALJ's conclusion that Dr. Robinson's findings were inconsistent with Sudac's activities because he maintained a 3.95 GPA in college and was able to attend classes, the record indicates that Sudac was able to attend classes because he structured them in a manner that accommodated his IBS and paruresis. See R. at 24 (noting that Sudac scheduled classes so as to include four-hour gaps, to allow him to travel home for bathroom use). His treating sources consistently noted that his IBS and paruresis symptoms were related to, and were exacerbated by, his severe anxiety. See R. at 369 (Dr. Robinson); id. at 383 (Dr. Hannan); id. at 403 (Dr. Liebmann).

The ALJ did not address the evidence in the record that indicated Sudac structured his life around his ability to use his home bathroom for long periods of time, except to note that Sudac's scheduling of a four-hour gap between his college classes so that he could use his home bathroom was a "preference not a medical necessity" or "medical condition." Id. at 24–25, 31. The ALJ cited to no medical evidence in the record to support this conclusion. By contrast, the treatment notes from Sudac's

providers indicate that his paruresis was substantially more limiting than a "preference." Dr. Robinson described Sudac's condition as a "serious aversion to using any bathroom other than at his home." Id. at 369. She added that Sudac became "physically unable to eliminate urine or bowel" as a result. Id. Dr. Hannan reported that Sudac's fear of public restroom use directly limited the "places [Sudac] goes and how long he stays out." Id. at 383. Dr. Liebmann categorized Sudac's bathroom-related symptoms as "obsessions." Id. at 403. And, while Dr. Hannan described Sudac as "much" and "reliably" improved after his therapy sessions aimed at treating his inability to use public restrooms via exposure therapy, he maintained that (1) Sudac still exhibited difficulty in using public restrooms, and (2) would benefit from continued treatment. Id. at 545. No medical opinion described Sudac's symptoms as preferences, and the record does not support such a conclusion.

An ALJ may not substitute his or her own lay opinion in place of medical testimony. See Selian, 708 F.3d at 419. The record supports a finding that Sudac's ability to take part in college classes was predicated on a schedule that allowed him significant gaps in the day to address his IBS and paruresis symptoms. It is unclear how such a record contradicts, rather than supports, Dr. Robinson's finding that Sudac would have difficulty completing a full workday or workweek without interruptions caused by his psychological symptoms. Because the ALJ did not point to evidence in the record that would support her conclusion, she failed to provide "good reasons" for the weight afforded to Dr. Robinson's opinion.

Finally, the ALJ noted that Dr. Robinson's opinion in 3F was entitled to little weight because it was contradicted by her later submission of responses to a Mental

Impairment Questionnaire, Exhibit 24F.  R. at 15.  However, Dr. Robinson noted the

same diagnoses as in Exhibit 3F: OCD, Major Depressive Disorder, and IBS.  Id. at 645.

While Dr. Robinson noted that Sudac was either average or displayed only occasional

problems or reduced ability as to "Activities of Daily Living," see id. at 647, she noted, as

she did in Exhibit 3F, that Sudac exhibited frequent problems and limited ability with

regard to his "ability to persist in simple activities without interruption from psychological

symptoms."  Id. at 648.  Moreover, the functional areas assessed in the two exhibits are

not identical, nor are the scales by which the answering medical source is meant to

measure their responses, making a summary comparison of the two especially difficult.

Compare R. at 373–74 with id. at 647–48.

It is not clear that Dr. Robinson's later submission in Exhibit 24F is contradictory

of her earlier submission in Exhibit 3F.  Both indicate Sudac's history of anxiety, OCD,

depression, and IBS, and both indicate that Sudac's mental impairments would

significantly limit his ability to carry out everyday tasks without interruption.  Because the

reasons provided for the little weight afforded to Dr. Robinson's opinions are not borne

out by the record, the ALJ committed legal error in failing to provide the requisite "good

reasons" for her determination that Dr. Robinson's opinion in Exhibit 3F and her opinion

in Exhibit 24F as to Sudac's limited ability to persist in simple activities were entitled to

little weight.

### 4.  Dr. Liebmann, M.D.

Dr. Liebmann noted that Sudac exhibited the following symptoms: (1) feelings of

guilt or worthlessness; (2) generalized persistent anxiety; (3) mood disturbance;

(4) emotional withdrawal; (5)  unstable interpersonal relationships; (6) somatization

unexplained by organic disturbance; and (7) difficulty thinking or concentrating.  Id. at

680. He noted that Sudac exhibited "continuing obsessive worry and inability to use public bathrooms." Id. In addition, Dr. Liebmann indicated that Sudac exhibited "recurrent obsessions or compulsions," "intrusive recollections," "severe panic attacks," and persistent irrational fears. Id. at 681. Dr. Liebmann also concluded that Sudac's mental abilities would preclude him from doing the following "more than 15% of the time:" (1) working with others without distraction; (2) accepting and responding appropriately to both instructions and criticism from supervisors; (3) getting along with co-workers; (4) dealing with normal work stress; and (5) travelling to unfamiliar places. Id. Dr. Liebmann also checked the box indicating that Sudac would be "off task" 25% or more of a typical workday. Id. at 682. The ALJ afforded Dr. Liebmann's entire opinion "little weight" because there was "no evidence to support" the doctor's finding that Sudac would be off-task 25 percent or more during a workday as a result of his symptoms, in light of his activities and his college GPA. R. at 33.

The ALJ failed to point to any medical evidence on the record to support the conclusion that Dr. Liebmann's opinion should not be afforded controlling weight, let alone that it should be afforded "little weight." The ALJ merely stated, without explanation or citation, that Doctor Liebmann's findings that Sudac would be "off-task" for 25 percent of a workday were contradicted by Sudac's activities and GPA. As noted above, the ALJ's review of Sudac's activities mischaracterized the record. See supra at 8–10. Moreover, the ALJ did not address the consistency of Dr. Liebmann's findings with the other treating source opinions, the length of Dr. Liebmann's treatment relationship with Sudac,[5] whether he was an expert on the issues addressed, or any of

the other factors mandated by SSA regulations.  See 20 C.F.R. § 416.927(c).  On remand, should the ALJ determine that Dr. Liebmann's opinions are not entitled to controlling weight, she is obligated to apply the factors and provide "good reasons" for the value he assigns the opinions.  See 20 C.F.R. § 404.1527(c); id. § 416.927(c).

### 5.  Dr. Scheimann, M.D.

The ALJ gave little weight to the findings submitted by Dr. Scheimann.  R. at 24.  Dr. Scheimann submitted a Physical Questionnaire, in which she noted that Sudac's diagnoses included, inter alia, depression, social anxiety disorder, OCD, paruresis, and IBS.  Id. at 687.  Scheimann concluded, inter alia, that Sudac could walk more than two blocks without pain or rest; that he could remain sitting or standing for an hour before needing to change position; that Sudac could frequently lift up to 25 pounds, but rarely could lift more than 25 pounds; and that Sudac could rarely carry more than 20 pounds.  Id. at 688–89.  Scheimann also concluded that Sudac would be absent from work more than four days a month due to difficulty using the bathroom, and that Sudac would be off-task 25% or more of the time on any given workday.  Id. at 690.

The ALJ, as noted, gave these findings little weight.  However, the ALJ failed to provide any citation to the record to support her conclusion.  Rather, the ALJ simply concluded, without citation or explanation, that Scheimann's findings were "intrinsically contradictory with the claimant's activities and generally benign exams . . . ."  Id. at 24.  The ALJ did not cite to the "benign exams" to which she referenced, and it is unclear from the ALJ's Decision what, if any, specific medical evidence supported her

---

[5] The ALJ did note the frequency of treatment, though the decision does not indicate whether the noted frequency of treatment was descriptive or was a substantive factor in the weight given to Dr. Liebmann's opinion.  R. at 33.

conclusion.  In failing to support, with citation to medical evidence, her judgment that Dr. Scheimann's opinion was entitled to little weight, the ALJ violated the treating physician rule, and failed to provide good reasons for her decision.  See Sarchese v. Barnhart, No. 01-CV-2172(JG), 2002 WL 1732802, at *4 (E.D.N.Y. July 19, 2002) (finding that ALJ violated treating physician rule by, inter alia, failing to support judgment with citation to medical evidence); Padilla v. Berryhill, No. 15CIV9312VBLMS, 2018 WL 3598766, at *9 (S.D.N.Y. June 22, 2018), report and recommendation adopted, No. 15 CV 9312 (VB), 2018 WL 3597639 (S.D.N.Y. July 26, 2018) (holding that ALJ failed to provide good reasons for decision where ALJ's Decision omitted discussion of how doctor's assessment was inconsistent with particular evidence, and where "[t]he ALJ made no citations to specific portions of the record").

Moreover, while the Commissioner belatedly argues on appeal that Scheimann's findings were inconsistent with her own treatment records, see Mot. to Affirm at 7–8, the ALJ did not advance that as a basis for her findings, nor did she cite to any of Scheimann's treatment records to support her conclusions.  It has long been established that a reviewing court "may not accept appellate counsel's post hoc rationalizations for agency action."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see also Thomas v. Colvin, 302 F. Supp. 3d 506, 511 (W.D.N.Y. 2018) ("[I]t is well settled that post hoc rationalizations are not an appropriate substitute for an ALJ's duty to support her conclusions by reference to substantial evidence.").

For the reasons already stated, the ALJ erred by mischaracterizing the record as to Sudac's stated activities and failing to address the required factors in determining the weight afforded to a treating source opinion.  See supra at 8–10, 17–18.  On

remand, should the ALJ determine that Dr. Scheimann's opinions are not entitled to controlling weight, she is obligated to apply the factors and provide "good reasons" for the value he assigns the opinions.  <u>See</u> 20 C.F.R. § 404.1527(c); <u>id.</u> § 416.927(c).

The court concludes that the ALJ erred by failing to properly apply the treating physician's rule.  On remand, the ALJ should analyze whether to afford the treating physicians' opinions controlling weight and, if not entitled to controlling weight, to state the record basis for that conclusion and assess the amount of weight they merit.[6]

    C.    <u>Disposition</u>

Sudac requests vacatur of the ALJ's decision and that this court enter a finding of disability.  <u>See</u> Sudac. Mem. in Supp. at 20.  Section 405(g) of title 42 of the United States Code provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner "with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (2016).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development.  On the other hand, we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."  <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980) (citations omitted).

"Remand is particularly appropriate where [the court] is unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer

---

[6] Because the ALJ's Decision is being remanded on other grounds which necessarily require reexamination of the record and all medical opinions, including those of the consultative sources, the court does not reach the question of whether the ALJ committed legal error in assigning excessive weight to the opinions of state consultative medical sources.

explanation for the decision." <u>Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996) (internal citations and quotation marks omitted).  Because the ALJ misapplied the treating physician rule and prevented meaningful judicial review by failing to state the reasons for her conclusions, remand is appropriate.

## VI.    CONCLUSION

For the reasons stated above, the Motion for Judgment on the Pleadings is **GRANTED**, and the Motion for Order Affirming the Decision of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this Ruling. The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 24th day of April 2019.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge